**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

PAUL BLACKWELL,                          )
                                         )
              Plaintiff,                  )
                                         )
v.                                       )          Case No. 04-CV-060-GKF-PJC
                                         )
UNUM INSURANCE COMPANY OF                )
AMERICA, JOHN DOES 1-20,                 )
                                         )
              Defendants.                 )

## OPINION AND ORDER

Plaintiff Paul Blackwell ("Blackwell") brings this suit under the Employee Retirement Income Security Act, 29 U.S.C. §1001, *et seq.* ("ERISA"), seeking judicial review of the decision to deny him long term total disability benefits under the group disability insurance plan provided by his former employer, Beverly Enterprises, Inc. ("Beverly") and issued and administered by defendant UNUM Life Insurance Company of America ("UNUM").

### I. Standard of Review

UNUM, as administrator of the disability plan, had discretion under the plan to determine whether Blackwell qualified for benefits. Therefore, the court's review is limited to determining if the decision was arbitrary or capricious. *Chambers v. Family Health Plan Corporation,* 100 F.3d 818, 825 (10th Cir. 1996); *Sandoval v. Aetna Life and Casualty Insurance Co.,* 967 F.2d 377, 380 (10th Cir. 1992).   Under this standard, '[t]he Administrator['s] decision need not be the only logical one nor even the best one.  It need only be sufficiently supported by facts within [his] knowledge to counter a claim that it was arbitrary or capricious." *Kimber v. Thiokol Corporation,* 196 F.3d 1092, 1098 (10th Cir. 1999), quoting *Woolsey v. Marion Laboratories, Inc.,* 934 F.2d 1452, 1460 (10th Cir. 1991)  The decision will be upheld unless it is not grounded on *any*

reasonable basis.  *Id.*  The reviewing court "need only assure that the administrator's decision fall[s] somewhere on a continuum of reasonableness–even if on the low end."  *Id.*

However where the claim administrator is also the insurer of the plan, the court should apply a "less deferential standard" of review.  Under this standard, the administrator "bears the burden of proving the reasonableness of its decision pursuant to the Tenth Circuit's traditional arbitrary and capricious standard."  *Id.*    The court earlier determined that since UNUM both issued the benefit plan and had fiduciary discretionary authority to determine eligibility, it was operating under an inherent conflict of interest while determining Blackwell's eligibility, the standard set out in *Fought v. UNUM Life Ins. Co. of America,* 379 F.3d 997, 1006 (10th Cir. 2004) would apply to the judicial review of UNUM's denial of plaintiff's application for long term disability benefits. [Doc. No. 62].  Thus, the administrator "bears the burden of proving the reasonableness of its decision pursuant to the Tenth Circuit's traditional arbitrary and capricious standard."  *Fought* at 1006.[1]  The administrator must demonstrate that its interpretation of the terms of the plan is reasonable and its application of those terms to the claimant is supported by substantial evidence.  *Id.*  "Substantial evidence" is "such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decision maker."  *Sandoval v. Aetna Life & Cas. Ins. Co.,* 967 F.2d 377, 382 (10th Cir. 1992).  Substantial evidence requires "more than a scintilla but less than a preponderance" of evidence.  *Id.*  This standard allows a "flex" of the traditional "arbitrary and capricious" standard to allow a reviewing court to adjust for the

---

[1]Citing *Pinto v. Reliance Standard Life Ins. Co.,* 214 F.3d 377, 393 (3d Cir. 2000), Blackwell asserts the focus of the court should be on reasonableness of the "process by which the result was achieved," as opposed to whether the decision itself is reasonable. [Doc. No.67, pp. 16-17 of 30].  However, Blackwell cites no Tenth Circuit cases accepting the Third Circuit's approach.  The *Fought* standard–whether the decision itself was reasonable–remains the law for this circuit.

circumstances alleged, such as trustee bias in favor of a third party or self-dealing by the trustee. *Fought* at 1006.  Thus, the court considers UNUM's conflict of interest as one factor in determining whether UNUM's denial of disability benefits to Blackwell was arbitrary and capricious.  *Id.* at 1005.[2]

In determining whether a plan administrator's decision was arbitrary and capricious, the district court must make its decision based upon the arguments and evidence before the plan administrator at the time the administrator made its decision to deny benefits.  *Sandoval,* 967 F.3d at 381.

In this case, Blackwell contends UNUM's decision is not supported by substantial evidence in the administrative record.

## II.  Background/Terms of Policy

Blackwell,  a former employee of Beverly Enterprises, Inc. ("Beverly"), participated in Beverly's long-term disability income plan, which was funded by a long-term disability insurance policy, Policy No. 532518 001 (the "Policy") issued by UNUM to Beverly January 1, 1999. [Doc. No. 51, Administrative Record ("AR"),Vol. III, Policy 0002].  Under the terms of the Policy, individuals in payband D and above are "disabled" when UNUM determines that:

- you are **limited** from performing the **material and substantial duties** of your regular occupation due to your **sickness** or **injury**; and
- you have a 20% or more loss in your **indexed monthly earnings** due to the same sickness or injury; and
- during the elimination period you are unable to perform any of the material and substantial duties of your regular occupation.

_____

[2]The Tenth Circuit's standard for review of decisions in "inherent conflict" cases is consistent with the Supreme Court's decision in *Metro Life Ins. Co. v. Glenn,* 128 S.Ct. 2343 (2008), where the court identified a "combination of factors" methodology for district courts' review for abuse of discretion.

[*Id.,* Policy 0015] (emphasis in original).[3]  Under the Policy, "UNUM may require you to be examined by a doctor, other medical practitioner or vocational expert of UNUM's choice," and "can require an examination as often as it is reasonable to do so."  [*Id.*]   "Regular occupation" is defined as:

> ...the occupation you are routinely performing when your disability begins.  UNUM will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location.

[*Id.,* Policy 0039].  The term "material and substantial duties" is defined as duties that:

- are normally required for the performance of your regular occupation; and
- cannot be reasonably omitted or modified, except that if you are required to work on average in excess of 40 hours per week, UNUM will consider you able to perform that requirement if you are working or have the capacity to work 40 hours per week.

[*Id.,* Policy 0038].

Blackwell, a registered nurse, became Vice President of Quality Management of Beverly in 1997.  At the time, Beverly was the nation's largest owner of nursing facilities. Blackwell claims that most of his time was spent traveling to Beverly's regional offices and to more than 550 facilities nationwide.  Thus, he contends he spent "the vast majority of his working time on the road, in the air, in hotels, and in facilities spread throughout the nation." **[**Doc. No. 67, Plaintiff's Opening Brief, p. 2.].  Blackwell contends that in 2000, he began experiencing severe pain and stiffness in his joints and back, which affected his ability to conduct the travel necessary

---

[3] The Administrative Record reflects Blackwell was in payband D or above.  Specifically, Blackwell told UNUM he was in payband C, which is above payband D [*Id.,* UACL0032] and UNUM repeatedly identified the policy as an "own occupation" policy. [*See, i.e.,* UACL00237, 00152, 00156, 00161].

4

for his job. [*Id.*] He continued to work until December 18, 2001, at which time he claims he was unable to continue the material duties of the job.  On February 6, 2002, Blackwell, then 52 years old, filed a claim for long term disability benefits with UNUM.

UNUM denied the disability claim on July 26, 2002.  Blackwell appealed the decision, and UNUM upheld its earlier denial on December 16, 2002.  Blackwell sued UNUM in Tulsa County District Court, and UNUM removed the case to this court.

### III.  Plaintiff's Health and Disability Claims History

### A.  Blackwell's Treating Physicians

1.  On May 16, 2000, Blackwell was seen by Mouhammad K. Sheikha, M.D., at the Cooper Clinic in Fort Smith, Arkansas, complaining of pain in the left shoulder and low grade fever, chills and cough. [AR, Vol. 1, UACL 00066].  He was diagnosed with "Left shoulder pain and bursitis, and also acute upper respiratory tract infection," and prescribed Vioxx 25 milligrams a day and a Z-Pak to use as directed. [*Id.*] On July 27, 2000, a CT scan of his lumbar spine was performed. [*Id.*, UACL 00068].  The report, which notes "low back pain" in the Clinical History, states, under "CT SCAN OF THE LUMBAR SPINE":

> Scan from mid L3 down toS1 was accomplished.  3-4 disc is showing some mild annular bulging but not focal protrusions.  Mild facet hypertrophy noticed at this level.  4-5 also shows diffuse bulging, mild ligamentum flavum hypertrophy and facet hypertrophy with overall slight canal stenosis.  5-1 also shows mild disc bulging.  Again, no focal protrusion is seen.

[*Id.*] Under "IMPRESSION":

> Multilevel diffuse disc bulges 3-4 down through 5-1.  Mild canal stenosis at 4-5 secondary to the disc bulge, facet hypertrophy and ligamentum flavum hypertrophy. No focal protrusions or herniations seen.

[*Id.*]

5

2.  On July 31, 2000, St. Edward Mercy Medical Center, Department of Radiology,

Nuclear Medicine and Medical Imaging performed a lumbar spine MRI on Blackwell. [*Id.*,

UACL 00071-72].  The reason stated for the exam was "low back pain." [*Id.*] The MRI report

stated:

> There is disc degeneration L4-5 and L5-S1.  There is mild broad base central disc
> protrusion L4-5 with very mild impression on the thecal sac.  Mild diffuse disc
> bulging L5-S1 and to a lesser extent L3-4.  There is no significant spinal
> canal stenosis or foraminal stenosis evident.

[*Id.*]

3.  On June 6, 2001, Blackwell was seen by Dr. Sheikha at the Cooper Clinic because he

needed a refill of his Vioxx and also had a cough and drainage. [*Id.*, UACL 00082].  He was

given a refill of Vioxx and a prescription for Allegra and advised to quit smoking. [*Id.*].  Under

"FINAL DIAGNOSIS," the report states: "1. The patient was diagnosed with chronic pain.  2.

Cough related to allergic rhinitis." [*Id.*]

4.  On October 5, 2001, Blackwell was seen by Daniel C. Martin, D.O., in Glenpool,

Oklahoma for a yearly physical. [*Id.*, UACL 00085].  Dr. Martin's remarks on the form are almost

entirely illegible, although under "Examination" the muscoskeletal system is marked as

"abnormal."  On November 9, 2001, he visited Dr. Martin again with the "Chief Complaint,"

noted as "Go over records." [*Id.*, UACL 00094].  Once again, Dr. Martin's hand-written notes on

the form are almost entirely illegible and the muscoskeletal system is marked as "abnormal." [*Id.*]

On December 12, 2001, Blackwell visited Dr. Martin and the "Chief Complaint" is listed as: "f/u

visit Dr. McKay." [*Id.*, UACL 00095].  Under "Diagnosis" is what appears to be the word

"arthritis." [*Id.*]

5.  On November 26, 2001, rheumatologist James McKay, D.O., sent Dr. Martin a letter

noting the results of his consultation with Blackwell. [*Id.*, UACL 00119-20].   Under

"Impressions," he listed:

1. Symmetrical polyarthralgias
2. Weakly positive rheumatoid factor
3. History of low back pain

[*Id.,* UACL 00120].   He stated Blackwell had described "progressive joint pain in increasing

severity," the onset of which was 18 months previously. [*Id.*]. Blackwell told him he traveled

quite frequently, drove significant distances and was troubled with chronic shoulder pain. [*Id.*].

Further, Blackwell told him in the preceding four to six weeks, his joint paint "seems to be

increasing and involving more joints." [*Id.*].   The doctor noted:

> Passive range of motion was normal in cervical spine, shoulders, elbows, wrists,
> hips, knees, and ankles.  The PIPS of each hand were reduced 50% in flexion
> range of motion.  There were no signs of actual joint effusion, nodulosis,
> sclerodactyly, cutaneous vasculitis, digital ischemia, or RA like deformity.

[*Id.,* UACL00119].  Under "Summary," he stated:

> In summary, your patient appears to have symmetrical polyarthralgias which
> date back for over a year.  This may represent osteoarthritis but could also have
> an inflammatory component.

[*Id.*]

6.  On December 27, 2001, Blackwell saw Dr McKay again. [*Id.*, UACL 00127-28].

Under "Assessment and Plan," Dr. McKay noted joint pain and  "weakly positive RA," and

ordered a bone scan. [*Id.,* UACL 00127].

7.  On January 2, 2002, a bone scan of Blackwell's hands and feet was performed at

Southcrest Hospital.   [*Id.,*  UACL 00098].  The stated reason for examination was "polyarthritis."

[*Id.*] Under "PROCEDURE/FINDINGS," the report stated:

> Twenty-five millicuries of technetium 99m-MDP was performed.  Localization

7

to the L3 would be suspicious for a component of mild compression deformity or posttraumatic deformity.  This could be correlated clinically.  There appears to be some diffuse mild localization to the knees, wrists, hands, and elbows suspicious for perhaps some mild degenerative process.

In the feet, there is localization to the plantar aspect of the right calcaneus and the first metatarsophalangeal joints bilaterally left greater than right.  In the wrist, there is faint diffuse localization to the wrists bilaterally, slightly focal, involving the medial right carpals and right distal interphalangeal joint.

[*Id.*] Under "IMPRESSION," the report stated:

1. Localization L3 vertebral body of uncertain etiology.  Mild compression, question posttraumatic.
2. Mild diffuse degeneration in the knees, wrists, hands, and feet.
3. Focal localization of metatarsophalangeal joints left greater than right probably degenerative as well as right calcaneus.

[*Id.*]

8. On January 3, 2001, Blackwell was seen by a podiatrist, Maureen L. Crotty, D.P.M., for ingrown toenails of both feet. [*Id.*, UACL 00047-52].  Under "History of Present Illness," Dr. Crotty noted Blackwell stated he had been diagnosed with rheumatoid arthritis and was "too stiff in his back, knees, and fingers" to trim out the toenails. [*Id.,* UACL 00050].   Under the "Musculoskeletal" section of "Podiatric Physical Exam,"  Dr. Crotty noted:

Muscle tone and strength of dorsiflexors, plantarflexors, invertors and evertors is noted to within normal limits bilateral.  Somewhat splinted due to pain.  No overt bony deformities noted at this time.

[*Id.*].

9. On January 9, 2001, Blackwell saw Dr. Martin for "F/U on arthritis." [*Id.,* UACL 00096].  Under "diagnosis," Dr. Martin listed "arthritis" and "RA." [*Id.*].

10. Dr. McKay saw Blackwell again for a follow up exam on January 21, 2002. [*Id.*, UACL 00121-23].  Dr. McKay's assessment of Blackwell that date was "1. Osteoarthritis, and 2.

8

Weakly positive RA–not significant." [*Id.,* UACL 00122].

11. On February 9, 2002, Blackwell again saw Dr. Martin. [*Id.*, UACL 00099]. Under "Chief Complaint" was the statement: "Needs disability forms filled out [unreadable] rheumatoid arthritis." [*Id.*]

12. On March 4, 2002, Dr. McKay again saw Blackwell. [*Id.*, UACL 00124-26]. Dr. McKay's assessment of Blackwell  remained unchanged and under "Musculoskeletal Exam, " he noted no synovitis and a normal range of motion of all joints. [*Id.,* UACL 00126].

13. On March 7, 2002, Dr. Martin saw Blackwell for arthritis. [*Id.*, at UACL 00100]. Under "Diagnosis" he listed: "1. RA [Rheumatoid Arthritis], 2. Arthritis, 3. [blank], 4. G.I. [unreadable]. [*Id.*]  Dr. Martin also had Blackwell's level of C-reactive protein (which measures general levels of inflammation in the body),  tested. [*Id.*, UACL 00103].  The test showed his level to be normal. [*Id.*].

14. On April 18, 2002, Dr. Martin again saw Blackwell, with "Chief Complaint" listed as "fill out form." [*Id.,* UACL00144] and noted, in Pertinent Findings, "OA "and "RA." [*Id.*].

**B.  Plaintiff's Disability Application**

15. Blackwell applied for disability benefits on February 6, 2002. [*Id.,*UACL 00016-18]. He filled out both the "Attending Physician's Statement" portion of the application and the "Claimant's Statement." [*Id.*].  His family practitioner, Dr. Martin, signed the Attending Physician's Statement. [*Id.*]  The "Objective findings" subsection of the Attending Physician's Statement states: "RA Positive 10/05/01.  Bone Scan 01/02/02 showed mild diffuse degeneration to multiple joints," and the "Symptoms" subsection states: "Pain & Stiffness bilateral hands.  Pain in shoulders, wrists, knees, feet & back." [*Id.,* UACL 00018].  The form indicates symptoms first

appeared in 20001 and RA appeared on 10/5/01. [*Id.*].  The response to the question, "Has patient ever been treated for the same or similar condition," states: "Osteoarthritis beginning 2000." [*Id.*]. The "Restrictions (What the patient should not do)" subsection states: "Writing & typing which would aggravate symptoms.  Excessive activity which irritates joints." [*Id.*].  The "Limitations (What the patient cannot do)" subsection states: "Cannot lift luggage & laptop computer.  Cannot fly, or drive for extended periods.  Cannot sit or stand without changing position frequently. Cannot bathe or dress without assist.  Cannot climb stairs." [*Id.*]

16.   UNUM acknowledged receipt of plaintiff's disability claim on February 18, 2002. [*Id.*, UACL 00021].   On February 26, 2002, UNUM completed a "Walk-in: Review" based on available medical records. [*Id.,* UACL, 00043].   Under "Review," the reviewer, Janet Shepard, stated: "Available medical records do not support lack of work capacity due to RA.  1-02 bone scan → + diffuse degenerative joints in hands & feet–no fusion or other abnormalities.  Lab work 11-01–ANA < 1:80 Sed rate S." [*Id.*].  On February 28, 2001, UNUM faxed medical records requests to Blackwell's health care providers. [*Id.,* UACL 00044-46].

17.   Following receipt of the medical records, on April 8, 2002, UNUM requested an In-House Clinical Review, asking whether the medical records supported restrictions and limitations listed on the application and for any other comments to further clarify claimant's condition or prognosis. [*Id.,* UACL00133].  The review was performed by D. Scott Farley, RN. [*Id.,* UACL 00131-32].  Farley reviewed records from Drs. Martin, McKay and Crotty, as well as the Cooper Clinic. [*Id.*].  In a report dated April 8, 2002, he concluded:

> Based on the medical records at hand including those of Dr. McKay the
> R and L's listed appear to be excessive.  The rheumatologist feels that this
> is Osteoarthritis.  The labs and exam findings are not consistent with
> Rheumatoid Arthritis.  On exam the claimant does no [*sic*] show any

evidence of warmth, synovitis or joint deformity.

[*Id.,* UACL 00131].  Farley forwarded the file to Laird D. Caruthers, M.D., Vice-President and

Medical Director of UNUM, for a full medical review. [*Id.*].

18. Dr. Caruthers reviewed the file and prepared a Medical File Review on April 12,

2002. [*Id.,* UACL 00134-35].  He stated:

> ...[C]laimant was seen by Dr. Martin, family physician.  We have a series of
> basically indecipherable handwritten monthly office visit notes from Dr.
> Martin from October 5, 2001 through March 7, 2002.  The claimant was
> complaining of shoulder and knee pain...

[*Id.,* UACL 00135].  Dr. Caruthers discussed records from plaintiff's visits to Dr. McKay,

including his note from the first visit that "there were no signs of actual joint effusion, nodulosis,

sclerodactyly, cutaneous vasculitis, digital ischemia, or RA-like deformity," and concluded that

Blackwell "appears to have symmetrical polyarthrlagias, which date back for over a year.  This

may represent osteoarthritis, but could also have an inflammatory component." [*Id.*].  He noted

that Dr. McKay saw Blackwell again on December 27, 2001, and stated there was no evidence of

synovitis or swelling or heat of any joints. [*Id.*] Dr. Caruthers observed, "There was no mention of

work capacity impairment or indication that claimant was having any significant problems other

than his self reported joint pain." [*Id.*].  In answer to the question, "Is there a work capacity

impairment supported by the medical documentation?" Dr. Caruthers opined:

> Claimant has complained of joint pain for a year or more.  There is some evidence
> of osteoarthritis, which is not uncommon in a 52-year-old individual, but there
> is no indication of any inflammatory process and no evidence of any work capacity
> impairment in the medical documentation.  If a more objective evaluation of
> claimant's functional capacity is desired an IME with a physiatrist and a concomitant
> FCE might be in order.

[*Id.,* UACL 00134].

11

19.  On April 15, 2002, UNUM sent Dr. Martin the Medical File Review prepared by Dr. Caruthers and asked for additional input from Dr. Martin, including whether he agreed or disagreed with the Medical File Review, what current restrictions and limitations he believed applied to Blackwell, Blackwell's prognosis for return to gainful employment, and whether Dr. Martin had completed the Restrictions and Limitations section as well as the other sections of the Attending Physician's Statement on Blackwell's application. [*Id.,* UACL 00137-38].  UNUM also asked the doctor to send it a prescription for a Functional Capacity Evaluation ("FCE"). [*Id.,* UACL 00150].

20.  On April 23, 2002, UNUM received Dr. Martin's response. [*Id.,* UACL 00150-51]. Dr. Martin did not disagree with any of Dr. Caruthers's findings. [*Id.,* UACL 00151].  In response to the question about current restrictions and limitations, he wrote: "No lifting, No repetitive hand movements." [*Id.*].  He stated the prognosis for return to gainful employment was "guarded" and he recommended part-time employment slowly with sedentary-type work.  [*Id.*].  In response to the question about whether he had completed the Restrictions and Limitations sections and other sections of the Attending Physician's statement, he stated: "completed with pt.–signed form." [*Id.,* UACL 00150].  He indicated he would set up the FCE. [*Id.*].

21.  UNUM arranged for NovaCare/VerNova to conduct an FCE to evaluate Blackwell's capacity to perform his regular occupation. [*Id.,* UACL 00155; Vol. II, UAIA 00036].  UNUM provided NovaCare/VerNova with a copy of Blackwell's job description. [*Id.,* UACL 00155; UAIA 00029-33],[4] and advised :

---

[4]The job description provided by UNUM to NovaCare appears to be an official job description prepared by Blackwell's employer, Beverly Enterprises, for job title Vice President - Quality Management, and attached to the long term disability claim forwarded to defendant by

> AP [attending physician] states restrictions as writing and typing which would aggravate symptoms.  Excessive activity which irritates joints.  Limitations are listed as cannot lift luggage and laptop computer.  Cannot fly or drive for extended periods.  Cannot sit or stand without changing positions frequently.  Cannot bathe or dress without assistance.  Cannot climb stairs.  Symptoms are listed as pain and stiffness, bilateral hands.  Pain in shoulders, wrists, knees, feet and back.  Medical records do not show any documentation of any inflammatory process and no medical evidence of any work capacity impairment.

[*Id*, UACL 00155].  On June 12, 2002, (after the FCE was performed), UNUM–apparently in response to a request for information from NovaCare/VerNova–forwarded NovaCare/VerNova an e-mail instructing:

> I discussed the request for specific job information with James' consultant and he has asked that the PT write their report based on what Mr. Blackwell can do, can not do and how often he can do it based on their testing and not on the specific occupation.  Our VOC specialist advised the occupation is considered sedentary/light and requires occasional standing and lifting due to travel.
>
> The claimant does research, analysis and prepared ongoing statistical evaluations for 500 facilities.  He also conducted facility assessments and council meetings in 30 states.

[*Id.,* Vol. 2, UAIA 00033].[5]

22.  NovaCare/VerNova physical therapist James Hix performed the FCE on June 5, 2002.

[*Id.*, Vol. I,  UACL 00174-94].  Regarding "Functional Abilities,"  Hix's report concluded:

---

Beverly on behalf of Blackwell. [*Id.*, UACL 00012-13].  Blackwell later sent UNUM a self-authored description of physical requirements for his job, which also listed compensatory strategies he had used to attempt to accommodate his physical limitations.  [*Id.,* UACL 00207-09].

[5]The introduction to the Functional Abilities Summary in the FCE report on Blackwell explains, "If job demands were provided with this evaluation, functional abilities are compared to the corresponding job demand level.  FCE performance below job demand is shown as a **Yes** in the deficit column, while mixed performance (both above and below the job demand level) is shown as **?** Indicating a possible deficit." [*Id.,* UACL00190].  The Job Demand and Deficit columns are blank, indicating job demands were not considered by the physical therapist.

Mr. Blackwell demonstrated the ability to perform the following Lifting activities at the Medium level: Low Lift and Mid Lift; at the Light level: High Lift.  Mr. Blackwell demonstrated the ability to perform the following activities on a Frequent basis: Walk, Kneel, Reach Immediate (L), Reach Immediate (R), Fingering, Push Cart 40 Lb, Pull Cart 40 Lb and Carry 20 Lb; on an Occasional basis: Stoop, Crouch, Handling, Climb Stairs, Sit and Stand.

[*Id.,* UACL 00192].  Regarding "Restrictions and Modifications," the report stated:

Mr. Blackwell did not demonstrate the ability to perform any particular activity for a long time.  With walking, the longer he walked the more fatigued he would get and tend to increase base of support with a more unsteady gait.  During the Climb Stairs task, he required assistance from the hand rails for balance.  With sitting he tended to adjust positions ever [*sic*] 2-3 minutes.

[*Id.*].  Under the heading, "Conclusions," the report stated:

Mr. Blackwell demonstrates the ability to perform his Low to Mid vertical plane activities within the MEDIUM physical demand classification (PDC) and his High vertical plane activities within the LIGHT PDC as determined through the Department of Labor based on an 8-hour workday and consistent with the enclosed abilities and limitations.  However, due to his inability to tolerate repetitive tasks, Mr. Blackwell should be permitted occasional positional changes and breaks throughout the day.

[*Id.*]

23.   UNUM subsequently requested and scheduled an independent medical examination ("IME") of Blackwell.  [*Id.,*  UACL 00160, 00167-69].  The IME was conducted by Timothy Pettingell, M.D., of Oklahoma Physical Medicine & Rehabilitation, P.C., on July 2, 2002. [*Id.,* UAC L 00197-204].  In connection with the exam, Dr. Pettingell reviewed records from Drs. Martin, McKay, Sheikha and Crotty. [*Id.,* UACL 00203-04].  He also reviewed diagnostic tests [*Id.,* UACL 00200], the FCE report [*Id.,* UACL 00199], and Blackwell's subjective report of the job requirements. [*Id.*].  The physician observed Blackwell in the waiting room while he completed an intake questionnaire form, and observed no difficulties with him filling out the paperwork. [*Id.,* UACL 00201]. Blackwell had no trouble changing clothes (including buttoning

14

and unbuttoning clothes) before and after the examination. [*Id.*] He had no difficulty transferring

to and from the examination table. [*Id.*].  The physical examination took 62 minutes. [*Id.*].

Under the topic, "Review of Systems," Dr. Pettingell reported Blackwell had noted

significant improvement in symptoms with a change in medication to Azulfidine on April 1,

2002.  [*Id., UACL 00201*].  Dr. Pettingell stated:

> The patient prior to April of this year and most significantly the fall of 2001 had
> noted limitations in ADLs primarily concerning dressing and bathing.  He describes
> moderate assist level dressing.  However, since treatment with Azulfidine, he is
> independent with all activities of daily living.  He currently does not require an
> assisted device for gait.  He currently ambulates 1-2 miles per day for exercise.  His
> children provide yard chores beginning in March of this year as Mr. Blackwell was
> unable to continue mowing the yard secondary to bilateral hand pain and low back
> pain.  Currently, he states that bilateral hand and lumbar spine symptoms are "much
> better".  This specifically is following the initiation of Azulfidine medication.

[*Id.*].

Dr. Pettingell recorded his "Impressions" as follows:

1.      Multiple joint osteoarthritis (degenerative arthritis).

2.      Weakly positive rheumatoid factor without definitive diagnosis of rheumatoid
        arthritis.  Review of medical records, specifically rheumatology, indicate that
        a definitive diagnosis of rheumatoid arthritis has not been given.  Most
        notably, rheumatologist has diagnosed symmetrical polyarthralgias with
        recent clinic notes indicating the diagnosis of osteoarthritis and a weakly
        positive RA (assuming weakly positive rheumatoid factor).  Examination
        today does not demonstrate significant limitations concerning joint mobility
        as specifically evaluating the cervical and lumbar spine, shoulder joints,
        elbows, wrist and digits, hip joints and ankle joints.  There are no findings
        consistent with peripheral edema or localized joint swelling.  There are
        deformities of joints as one might anticipate in osteoarthritis or rheumatoid
        arthritis (although such joint abnormalities may not initially be apparent to
        to visual inspection and may be first observed on x-rays).  The patient's
        bone scan was interpreted as consistent with degenerative arthritic changes.

[*Id., UACL 00199*].  Under "Discussion," Dr. Pettingell stated:

Taking into account the patient's FCE results as well as today's examination, also

taking into account the employer's description of job duties as well as the patient's personal perspective of job duties, at the present time I do not find the patient to be unable to perform his required job duties. At the present time, it is my opinion that the patient is able to perform his occupation as Vice President of quality management.  I currently do not recommend any restrictions or limitations concerning patient's job or home activities.

Although one may question temporary total disability status concerning inability to perform work duties specifically related to his occupation from December of 2001 through April 1, 2002, review of medical records (specifically that of the patient's rheumatologist) does not document objective abnormalities in detail to justify temporary total disability status.  The patient's clinical condition subjectively has significantly improved since the initiation of Azulfidine.  This medication was initiated on or about April 1 of this year.  The patient subjectively notes significant improvement in ADLs and joint pain following the initiation of this medication.

Concerning future treatment, it is recommended that the patient continue under the care of Dr. James McKay.  In the future, if disability is in question occupation-related and occupation-specific, disability forms would be more appropriately answered by the patient's rheumatologist as opposed to the patient's primary care physician. The patient's best course of treatment is through his rheumatologist.

[*Id.*]

24.  Dr. Caruthers was asked to review the FCE and IME and comment.  On July 22, 2002, he completed a Medical File Review. [*Id.,* UACL 00222-23].  The review summarized the conclusions reached in the FCE and IME (as noted above) and concluded:

The IME and FCE speak for themselves.  There is zero evidence to support a work capacity impairment.

[*Id.,* UACL 00222].

25.  By letter dated July 26, 2002, UNUM notified Blackwell his claim for disability benefits had been denied. [*Id.,* UACL 00226-29].  UNUM stated in the letter that Blackwell was not "disabled" from performing the duties of his occupation under the terms of the policy.  [*Id.,* UACL 00228].

16

26.  Blackwell appealed UNUM's decision on November 1, 2002. [*Id.,* UACL 00233].

UNUM conducted a Full Clinical Review of the claim on December 4, 2002.  [*Id.,* UACL 00235-

36].  The clinical consultant performing the review stated, "Review of the exam findings by

McKay, results of the FCE and observations noted in the IME by Pettingell would not provide

verifiable, demonstrable assessment of the loss of functional ability to [*sic*] due to either dx or tx."

[*Id.,* UACL00235].

27.  On December 15, 2001, UNUM in-house physician Jacob Martin, M.D., Board-

Certified in Occupational Medicine and Forensic Medicine, completed a Physician Review, in

which he was tasked with answering the questions:

> Does the available clinical data provide verifiable, demonstrable assessment of
> the loss of functional ability due to either the diagnosis or treatment?
> If so, for what continuous duration since 12/19/02?
> Please provide clinical basis of your conclusions.
>
> Does the clinical data reference any unavailable records of treatment, evaluation
> or assessment that, if obtained, would provide you a better understanding of the
> claimant's clinical status?  If yes, please identify them.

 [*Id.,* UACL 00237-39].  Dr. Martin concluded:

> SUMMARY: Current clinical documentation does provide clinical support for the
> diagnosis of polyarthragias related to osteoarthritis.  This condition appears to have
> been present for some time prior to DOD.  Serological testing has failed to provide
> definitive evidence of an inflammatory arthropathy, despite a weakly positive
> rheumatoid factor in 10/01; acute phase reactants (ESR and CRP) have been
> unremarkable.  There have not been convincing physical exam findings documented
> related to active synovitis.  . . .

[*Id.*].  Dr. Martin recited the findings of the IME physician, Dr. Pettingel, including his

conclusion that at the present time he did not find the claimant to be unable to perform his

occupation and recommended no restrictions or limitations. [*Id.,* UACL 00238].  In his

CONCLUSION, Dr. Martin answered the questions posed above as follows:

1.      The clinical documentation currently available for review does not appear to provide verifiable demonstrable assessment of the loss of functional ability due to either diagnosis or treatment: this is strictly from the general medical impairment perspective.  . . .

2.      The clinical data does not appear to reference any unavailable records of treatment or evaluation/assessment that, if obtained, would provide one with a better understanding of the claimant's clinical status.

[*Id.*].

28.  Hand-written notes of Burton McDaniel, M.O.P.T., indicate that on December 16, 2002, he conducted a Walk-In Clinical Review to answer the question, "Are R & L's supported form an orthopedic standpoint? [*Id.,* UACL 00240].  McDaniel stated: "Diagnostic studies performed during 7-2000 are of limited clinical significance after evaluating documented neurological findings." [*Id.*].

29.  On December 16, 2002, defendant notified plaintiff it was upholding its previous decision to deny benefits. [*Id.,* at UACL 00242-45].

**IV.  Analysis**

Under *Fought,* UNUM bears the burden of demonstrating that its interpretation of policy terms is reasonable and its application of the terms to Blackwell is supported by substantial evidence.  Blackwell's appeal focuses on the second element, i.e., whether UNUM's decision is supported by substantial evidence in the record.

UNUM asserts it conducted a thorough and exhaustive review of Blackwell's claim.  A review of the Administrative Record supports UNUM's assertion.  Upon receipt of the claim, it completed a Walk-In Review and  requested medical records from Blackwell's health care providers [§II. Plaintiff's Health and Disability Claims History, ¶16]; conducted an In-House Clinical Review **[***Id.,***** ¶17]; had its in-house physician, Dr. Caruthers, perform a Medical File

Review [*Id.,* ¶18]; sent Caruthers's report to plaintiff's family physician, Dr. Martin, for review

and input [*Id.,* ¶19]; had an FCE and an IME performed [*Id.,* ¶¶21-24]; and had Dr. Caruthers

review the results of those procedures before issuing its determination on Blackwell's disability

claim. [*Id.,* ¶25].

Blackwell, however, contends the entire process was a sham and UNUM ignored or

disregarded any opinions or evidence that did not meet its "preordained denial of benefits." [Doc.

No. 67, p. 22 of 30].  In support of this allegation, Blackwell contends UNUM failed to credit:

- A progress note of his family practitioner, Dr. Martin, on February 6, 2002,  in which he noted "RA" and polyarthritis" as diagnoses and set forth restrictions and limitations, including no writing and typing which would aggravate symptoms, and excessive activities which irritate joints; the Attending Physician's Statement of Disability (signed by Dr. Martin), which listed "RA" and polyarthritis and set forth various Restrictions and Limitations; Dr. Martin's response to the April 15, 2002, inquiry from defendant, in which he identified current Restrictions and Limitations of  "no lifting" and "no repetitive hand motions;" and an April 18, 2002, progress note of Dr. Martin stating "OA" and "RA" in his pertinent findings.[6]

- Exam notes of plaintiff's podiatrist, Dr. Crotty, relating plaintiff's statement to her that he had rheumatoid arthritis and was too stiff to trim his toenails.

- The November 26, 2001, notation of the rheumatologist, Dr. McKay, that plaintiff had polyarthralgais, a weakly positive rheumatoid factor and a history of low back pain.

- The FCE report, which he contends supported a conclusion that plaintiff was

_____

[6]Blackwell points out that many reviewers of Dr. Martin's notes stated they were unreadable or illegible, and–citing *Gilbertson v. Allied Signal, Inc.,* 328 F.3d 625, 635 (10th Cir. 2003) and *Gaither v. Aetna Life Ins. Co.,* 394 F.3d 792, 808 (10th Cir. 2004)–he criticizes UNUM, contending "*no one* bothered to contact Dr. Martin for clarification in his notes–they were simply disregarded in favor of other records." [Doc. No. 67, p. 22 of 30].  This statement is incorrect.  In fact, UNUM *did* contact Dr. Martin.  In its April 15, 200l letter to Martin, it enclosed Dr. Caruthers's report and asked Dr. Martin to indicate whether he agreed or disagreed with the findings and conclusions of the report.  Further, it requested additional input on several other issues, including current Restrictions and Limitations.  Notably, Dr. Martin did *not* disagree with Dr. Caruthers's report.

disabled.[7]

A review of the Administrative Record, however, contradicts this assertion.  The restrictions and limitations identified in the Attending Physician's Statement signed by Dr. Martin were discussed in the April 8, 2002 In-House Clinical Review, in which the reviewer, a registered nurse, concluded, "[b]ased on the medical records at hand including those of Dr. McKay the R and L's listed appear to be excessive." [¶17] The Medical File Review prepared by Dr. Caruthers noted that Dr. Martin saw Blackwell  a number of times from October 5, 2001 through March 7, 2002 for shoulder and knee pain. [¶18].  Dr. Caruthers went on to discuss the results of various lab tests ordered by Dr. Martin, including a normal CBC, normal comprehensive metabolic panel with the exception of a mildly elevated BUN; sed rate of 5, negative ANA, and weakly positive rheumatoid factor.   The Medical File Review also notes the Attending Physician Statement section of the disability claim appeared to have been filled out by plaintiff and signed by Dr. Martin, and it recites the restrictions and limitations listed therein. [*Id.*] Additionally, Dr. Caruthers discussed in detail plaintiff's initial and follow-up visits to Dr. McKay, and McKay's observations, including that "there were no signs of actual joint effusion, nodulosis, sclerodactyly, cutaneous vasculitis, digital ischemia, or RA-like deformity" and that plaintiff "appears to have symmetrical polyarthralgias, which date back for over a year.  This may represent osteoarthritis, but could also have an inflammatory component."   Dr. Caruthers also noted Dr. McKay did not identify any work capacity impairment or indicated claimant was having any significant problems

---

[7]Blackwell also claims it was improper for UNUM to have the FCE conducted before the IME.  This argument is inconsistent with his assertion that the IME physician improperly ignored the results of the FCE.  In any event, UNUM was under no contractual obligation to have either  evaluation performed, or to have them performed in any particular order.

other than his self reported joint pain.  Dr. Caruthers acknowledged plaintiff's podiatrist visit.  He

observed that on March 7, 2002, Dr. Martin obtained more lab tests.  C-reactive protein was

negative that day.  Dr. Caruthers concluded:

> Claimant has complained of joint pain for a year or more.  There is some evidence
> of osteoarthritis, which is not uncommon in a 52-year-old individual, but there is no
> indication of any inflammatory process and no evidence of any work capacity
> impairment in the medical documentation.

[*Id.*]   UNUM provided to NovaCare the restrictions and limitations identified in the Attending

Physician's Statement of the disability application for its use in the FCE. [¶21].  It provided the

FCE, all medical records, the official job description and Blackwell's own description of the

physical requirements of the job to Dr. Pettingell, the IME physician. [¶23].  Dr. Pettingell, in

turn, discussed the treating physicians' reports and notes and the restrictions and limitations

identified in the Attending Physician's Statement signed by Dr. Martin. [*Id.*].  He recorded

impressions of multiple joint osteoarthritis and "weakly positive rheumatoid factor without

definitive diagnosis of rheumatoid arthritis" and stated, "[r]eview of medical records, specifically

rheumatology, indicate a definitive diagnosis of rheumatoid arthritis has not been given." [*Id.*] He

took into account the patient's FCE results as well as his own examination of Blackwell, the

employer's description of job duties and Blackwell's description of physical demands of the job.

[*Id.*] He concluded, "[a]t the present time, it is my opinion that the patient is able to perform his

occupation as Vice President of quality Management."  Noting the patient's clinical condition

subjectively had improved since he started taking Azulfidine April 1, 2002, he stated: "Although

one may question temporary total disability status concerning inability to perform work duties

specifically related to his occupation from December of 2001 through April 1, 2002, review of

medical records (specifically that of the patient's rheumatologist) does not document objective

abnormalities in detail to justify temporary total disability status." [*Id.*].

It is clear that UNUM considered–but rejected–the opinion of Blackwell's family physician insofar as he diagnosed Blackwell as having rheumatoid arthritis and it rejected the restrictions and limitations identified in the Attending Physician's Statement of the disability application as being unsupported by medical evidence.  Instead, it concluded–based on the records of Dr. McKay, diagnostic tests, the evaluation by Dr. Caruthers, and the examination and evaluation by Dr. Pettingell–that Blackwell suffered from degenerative arthritis and the medical records did not document objective abnormalities justifying a finding that Blackwell was unable to perform his job.

ERISA requires that benefit plans afford a reasonable opportunity for a full and fair review of dispositions adverse to the claimant.  *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 830-31 (2003), citing 29 U.S.C. §1133(2).  However, administrators are not required to accord special deference to the opinions of treating physicians.  *Id.* at 811.  The Supreme Court, in declining to adopt a treating physician rule similar to that required by Social Security cases, stated:

> Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician.  But, we hold, courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plant administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.

*Id.* at 834.

Under Tenth Circuit law, UNUM's decision need not be the only logical one nor even the best one.  It need only be sufficiently supported by facts within UNUM's knowledge to counter a claim that it was arbitrary and capricious.  *See Chambers*, 100 F.3d at 818; *Sandoval,* 967 F.2d at

22

380.  Applying the *Fought* standard, the court concludes UNUM has carried its burden of establishing its decision was not arbitrary or capricious–i.e., its interpretation of the terms of the plan was reasonable and its application of those terms to Blackwell is supported by substantial evidence.

### V.  Conclusion

For the reasons set forth above, the court affirms defendant's decision denying plaintiff's claim for long-term disability benefits.

ENTERED this 24th day of March, 2010.


Gregory K. Frizzell
United States District Judge
Northern District of Oklahoma